## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **ELIE ARSHAM,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO.  JKB-14-2158** |
| **MAYOR & CITY COUNCIL** | * | |
| **OF BALTIMORE,** | * | |
| **Defendant** | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM

Pending before the Court is a motion to dismiss filed by the Defendant, the Mayor and City Council of Baltimore (the "City").  (ECF No. 14.)  The City seeks dismissal in part of Plaintiff Elie Arsham's first amended complaint.  (ECF No. 7.)  The motion has been fully briefed (ECF Nos. 17, 20), and no hearing is required, Local Rule 105.6 (D. Md. 2014).  The motion will be granted in part and denied in part.

### I.  Background

Arsham's complaint alleges she was discriminated against in her employment in the City's Department of Public Works ("DPW") "due to national origin or perceived national origin, gender, a hostile work environment, [and] disparate treatment."  (1st Am. Compl. ¶ 2.) Arsham also alleges she was subjected to unlawful retaliation and intentional or negligent infliction of emotional distress.  (*Id.*)  She pleads three counts:  Discrimination in violation of 42 U.S.C. § 2000e and "MD Code § 20-1013" (Count I), retaliation in violation of the same statutes (Count II), and intentional and/or negligent infliction of emotional distress (Count III).  In its motion, the City advanced five grounds to support dismissal:

1.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* does not recognize a cause of action for discrimination based on "perceived national origin."

2.  Plaintiff's failure to comply with the Maryland Local Government Tort Claims Act bars her state law claims against the City.

3.  Maryland law does not recognize a cause of action for negligent infliction of emotional distress.

4.  Plaintiff failed to set forth a cognizable claim for intentional infliction of emotional distress under Maryland law.

5.  No statutory provision exists with the citation "MD Code § 20-1013."

(Def.'s Mot. Dismiss 1-2, ECF No. 14.)

In her response, Arsham acknowledged that her claim of negligent infliction of emotional distress is not a viable claim under Maryland law and stipulated to its dismissal, while reserving argument on her claim of intentional infliction of emotional distress ("IIED").  (Pl.'s Opp'n 4, ECF No. 17.)  As to the City's fifth enumerated ground for dismissal, Arsham clarifies she is citing the section found in the State Government Article of the Maryland Code (Pl.'s Opp'n 8-9), and the City acknowledges that clarification but argues her "perceived national origin" claim also fails under the Maryland statute for the same reason the City argues it fails under Title VII (Def.'s Reply 6, ECF No. 20).  Finally, in the City's reply, it withdraws its second point pertaining to exhaustion under the Maryland Local Government Tort Claims Act because the City concedes Arsham acted to provide it with the requisite notice of her claims.  (Def's Reply 1.)  As a result of these acknowledgements and concessions, the only points to be addressed by the Court in this opinion are the first and fourth enumerated grounds.

## II.  Standard of Dismissal for Failure to State a Claim

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  An inference of a mere possibility of misconduct is not sufficient to support a plausible claim.  *Id.* at 679.  As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level."  550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . .  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).  Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555.

### III.  Allegations of the Complaint

Arsham alleges she began her employment with DPW on August 8, 1988, and rose to the level of Engineer II before her employment was terminated on January 17, 2014.  (1st Am. Compl. ¶ 7.)  Arsham's last assignment was in the DPW's Surface Water Management Division of the Environmental Engineering Section of the Bureau of Water and Wastewater.  (*Id.*)  During the course of her employment, she worked with Prakash Mistry, initially as colleagues; in March 2010, Mistry became her supervisor.  (*Id.* ¶ 8.)  Arsham alleges that Mistry's "discriminatory actions have been reinforced by the approval and oversight of his supervisor, Division Chief Ralph Cullison."  (*Id.*)

Before Mistry became Arsham's supervisor, he related in a conversation with her his speculation "that she was a member of the 'Parsee' ethnic group, and he expressed his disdain for the Parsee ethnic group at that time."  (*Id.* ¶ 9.)  Arsham alleges she "researched the Parsee

ethnicity and found it to originate in India, and through her belief it is one of the lower castes of Indian ethnic groups.  Mr. Mistry is believed to be of Indian descent."  (*Id.* ¶ 10.)  Arsham's "ethnic heritage is Persian (modern-day Iran)."  (*Id.*)

Arsham alleges the relationship between Mistry and her had never been good, but it "deteriorated precipitously" after March 2010 when Mistry became Arsham's supervisor.  (*Id.* ¶ 11.)  She alleges she was treated differently from the manner in which similarly situated colleagues were treated.  Males, employees of European descent, and African Americans were given benefits and treatment not given to Arsham.  (*Id.* ¶ 12.)  For example, Arsham was designated as an Engineer II, as was an African American male eight years junior to her at the job. (*Id.* ¶ 13.)  When Arsham requested time off, her absence was treated as Leave Without Pay, and she "was written up" each time she requested time off.  (*Id.*)  In contrast, when the African American male requested time off, his requests were granted without any punitive actions being taken.  (*Id.*)  Further, Arsham was required to get this junior colleague's approval on her leave slips in Mistry's absence, as well as to report to him on all of her projects, causing her embarrassment and humiliation.  (*Id.*)  Jackie McCullough, a Human Resources Representative, was specially assigned to keep track of Arsham's time, separate from any other employee in her division.  (*Id.*)

Arsham states she suffered financially due to "[t]he accumulation of unpaid suspended days and forfeited vacation days in a policy that was not carried out against other, similarly situated co-workers."  (*Id.* ¶ 14.)  Additionally, on several occasions, Mistry did not invite her "to project meetings where information would be shared and for which she was responsible, sabotaging any potential of success in her work."  (*Id.* ¶ 15.)  She alleges she had to use "investigative efforts to simply find out about meetings taking place so that she would have the

information necessary to do the job for which she was responsible." (*Id.*)  Further, she was

denied permission several times to visit job sites on projects for which she was responsible. (*Id.*

¶ 16.)  "This sabotage of her efforts at success was not committed against other, similarly

situated colleagues who were not female and believed to be Parsees." (*Id.*)  Arsham also alleges

she was, on more than one occasion, "questioned about her whereabouts when she stepped away

from her desk," unlike other similarly situated colleagues, and she attributes this disparate

treatment to her gender and national origin and Mistry's expressed views about Parsee people.

(*Id.* ¶ 17.)   Mistry yelled at Arsham during meetings, causing her embarrassment and

humiliation, and DPW management arranged for "the presence of security personnel for events

where she was present, when in fact she had never shown any signs of violent behavior." (*Id.*

¶ 18.)

Arsham filed an Equal Employment Opportunity Commission ("EEOC") charge of

discrimination on November 2, 2010. (*Id.* ¶ 19.)  She also says that her claims of discrimination

and disparate treatment were made known by her psychiatrist, Dr. O. Joseph Bienvenu, to DPW

leadership via emails and telephone calls in which "he expressed his dire concern for the way

Ms. Arsham was being treated by DPW.  The situation did not improve, and to the contrary,

deteriorated to the point where Ms. Arsham suffered a severe psychological episode/suicidal

incident in July 2013, as a direct result of the harassment and discrimination she experienced at

her rapidly deteriorating work environment." (*Id.*)

Arsham also alleges that when her counsel requested a "right to sue" letter from the

EEOC on October 3, 2013,

> DPW agents undertook a campaign to terminate Ms. Arsham's employment by
> stockpiling "occasions" of unauthorized leave, culminating with that termination
> on January 17, 2014, ostensibly for violating the department's leave policy, but, in
> reality, a pretext for pushing her discrimination claims forward in the process.

DPW's termination for cause has deprived her of retirement benefits she had rightfully earned for her many years of dedicated service to the City of Baltimore, had she not suffered this discrimination.

(*Id.* ¶ 20.)

## IV.  Analysis

### A.  Discrimination Based on Perceived National Origin

The City presents a superficially logical, but fundamentally abhorrent, argument: Title VII does not protect an individual from discrimination based on the individual's perceived national origin.  (Def.'s Mot. Summ. J. 8.)  The obvious corollary of this argument is that it is lawful for an employer to discriminate against an individual based upon the employer's mistaken perception of the individual's actual national origin because only the latter is specifically outlawed as a basis for discrimination.  A wrong guess, in other words, shields the employer from liability for discrimination that is no less injurious to the employee than if the employer guessed correctly regarding the employee's national origin.

The City's argument is premised upon the wording of 42 U.S.C. § 2000e-2(a)(1):

It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

The City points out that the word "perceived" is not included in this statutory provision.  That fact becomes, in the City's implicit view, a fatal omission that bars Arsham's claim of discrimination based on perceived national origin.  Surprisingly, several district courts have adopted this interpretation of Title VII and, in some cases, have contrasted the statutory language of 42 U.S.C. § 2000e-2(a)(1) with the language of the later-enacted Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the later-enacted Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

*et seq.*, both of which include a definition of "disability" encompassing an individual "being regarded as having such an impairment," 42 U.S.C. § 12102(1)(C), 29 U.S.C. § 705(9) (incorporating definition of disability in 42 U.S.C. § 12102).  Thus, this view effectively holds, if Congress, in enacting Title VII in 1964, had wanted to outlaw discrimination on the basis of perceived protected characteristics, it would have done so using wording similar to that it employed over twenty-five years later when it enacted the ADA.  *See Sears v. Jo-Ann Stores, Inc.*, 2014 WL 1665048, at *8 (M.D. Tenn. Apr. 25, 2014), *Report and Recommendation adopted by* 2014 WL 3672113 (M.D. Tenn. July 23, 2014); *Yousif v. Landers McClarty Olathe KS, LLC*, 2013 WL 5819703, at *3-4 (D. Kan. Oct. 29, 2013); *Guthrey v. Calif. Dep't of Corr'ns & Rehab.*, 2012 WL 2499938, at *6 n.2 (E.D. Cal. June 27, 2012); *Burrage v. FedEx Freight, Inc.*, 2012 WL 1068794, at *5-8 (N.D. Ohio Mar. 29, 2012); *El v. Max Daetwyler Corp.*, 2011 WL 1769805, at *6 (W.D.N.C. May 9, 2011), *aff'd*, 451 F. App'x 257 (4th Cir. 2011) (unpublished); *Adler v. Evanston Northwestern Healthcare Corp.*, 2008 WL 5272455, at *4 (N.D. Ill. Dec. 16, 2008); *Lopez-Galvan v. Mens Wearhouse*, 2008 WL 2705604, at *7 (W.D.N.C. July 10, 2008); *Lewis v. North General Hospital*, 502 F. Supp. 2d 390, 401 (S.D.N.Y. 2007); *Uddin v. Universal Avionics Sys. Corp.*, 2006 WL 1835291, at *6 (N.D. Ga. 2006); *Butler v. Potter*, 345 F. Supp. 2d 844, 850 (E.D. Tenn. 2004).

Congress may not have thought it necessary to revise Title VII to conform to the wording of the ADA if it was aware of the EEOC's published "Guidelines on Discrimination Because of National Origin," which include the Commission's definition of national origin discrimination. In 29 C.F.R. § 1606.1 (source:  45 Fed. Reg. 85635, Dec. 29, 1980), the EEOC stated,

> The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; *or because an individual has the physical, cultural or linguistic characteristics of a national origin group.*

(Emphasis added.)  The Commission further explained then,

> In order to have a claim of national origin discrimination under Title VII, it is not necessary to show that the alleged discriminator knew the *particular* national origin group to which the complainant belonged. . . . [I]t is enough to show that the complainant was treated differently because of his or her foreign accent, appearance or physical characteristics.

45 Fed. Reg. 85633 (Dec. 29, 1980).  This long-standing interpretation of Title VII is entitled to deference by federal courts.  *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 870-71 (2011) (concurring, Ginsburg, J.) (EEOC's statements in its Compliance Manual merit judicial deference as to interpretation of language in Title VII).  Deference in this instance is consistent with the opinion expressed in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), when the Supreme Court deferred to the Administrator's interpretation of the Fair Labor Standards Act:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.  The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 140.  *Contra Yousif*, 2013 WL 5819703, at *4 (refusing to defer to EEOC's interpretation of "perceived" discrimination based on Title VII's "explicit language," "clear case law stand[ing] for the opposite proposition," and "no valid authority recognizing perceived discrimination claims under Title VII").  This Court observes that the EEOC's Guidelines were adopted after promulgation of proposed, revised guidelines and receipt and incorporation of public comments.  Such a process is evidence of the thoroughness of the EEOC's consideration, and the Commission has not wavered since in its position.  Those two factors support this Court's deference to the EEOC's interpretation of "national origin discrimination."

The Commission's interpretation is also consistent with the 1991 amendment to Title VII, when Congress added subsection *m* to § 2000e-2.  Pub. L. 102-166, § 107(a).  That provision states, "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."   Subsection *a*, then, must be read in conjunction with subsection *m*— which must be given full effect—and doing so allows the conclusion that Congress did not intend to cabin Title VII's prohibition of invidious discrimination such that some forms of discrimination on the basis of protected characteristics are permissible.  The narrow reading of subsection *a* advanced by the City is inconsistent with Title VII's purpose as expressed by the Supreme Court:   "'to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin.'" *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 457 (1975) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)).  Treating certain people less favorably than others on the basis of a protected classification is the essence of disparate treatment.  *See Carter v. Ball*, 33 F.3d 450, 456 n.7 (4th Cir. 1994).  This is true regardless of whether an employer intends to discriminate against an individual expressly because of a protected characteristic or intends to discriminate based on the employer's perception, mistaken or accurate, of an individual's protected characteristic.  Accordingly, the Court rejects the City's argument.

This Court is not the first to conclude that employment discrimination based on an employer's perception of an employee's protected characteristic is actionable under Title VII. Three Circuit Courts of Appeals have done so.  In *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012), the court determined that a harasser's use of epithets associated with an ethnic

or racial minority different from that of the plaintiff employee "will not necessarily shield an employer from liability for a hostile work environment." *Id.* at 1299 and n.42 (relying on persuasive cases and EEOC's interpretation, "'Discrimination against an individual based on a perception of his or her race violates Title VII even if that perception is wrong,'" (quoting EEOC Compliance Manual § 15-II (2006)). Thus, the plaintiff's employer's perception that the plaintiff was an Indian or Native American when he was neither and that allegedly served as a basis for the employer's allegedly hostile treatment of plaintiff was a proper foundation for the plaintiff's cause of action pursuant to Title VII.

In *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393 (5th Cir. 2007), the court readily concluded, "[A] party is able to establish a discrimination claim based on its own national origin even though the discriminatory acts do not identify the victim's actual country of origin." *Id.* at 401. As a result, the court determined that the plaintiff, who was born in India, had submitted sufficient evidence of his employer's discrimination against him on the basis of his national origin, regardless of the fact that the harassers frequently referred to him as an "Arab."

In *Fogelman v. Mercy Hosp.*, 283 F.3d 561 (3d Cir. 2002), the court was faced with a claim of retaliation based upon an employer's perception that an employee had engaged in protected activity under the ADA and the Age Discrimination in Employment Act when, in fact, the employee had not done so. In finding that the plaintiff had presented a valid legal claim, the court stated,

> Because the statutes forbid an employer's taking adverse action against an employee for discriminatory reasons, it does not matter whether the factual basis for the employer's discriminatory animus was correct and that, so long as the employer's specific intent was discriminatory, the retaliation is actionable.

*Id.* at 565. Further, the court set forth its opinion as to what the result should be if the claim pressed is one under Title VII:

As an illustration by analogy, imagine a Title VII discrimination case in which an employer refuses to hire a prospective employee because he thinks that the applicant is a Muslim. The employer is still discriminating on the basis of religion even if the applicant he refuses to hire is not in fact a Muslim. What is relevant is that the applicant, whether Muslim or not, was treated worse than he otherwise would have been for reasons prohibited by the statute. We have adopted this same approach in the labor law context, where we have consistently held that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken belief that the employee engaged in protected activity. *See Fogarty v. Boles*, 121 F.3d 886, 891 (3d Cir. 1997); *Brock v. Richardson*, 812 F.2d 121, 125 (3d Cir. 1987).

*Id.* at 571.

Finally, although not a Title VII case, an opinion from the Ninth Circuit concluded a decedent's estate's trustee could assert a claim under 42 U.S.C. § 1983 based upon a municipality's alleged assumption that the decedent was Native American, even though he was white. *Estate of Amos v. City of Page, Arizona*, 257 F.3d 1086, 1094 (9th Cir. 2001). In so deciding, the court observed, "The City's alleged discrimination is no less malevolent because it was based upon an erroneous assumption." *Id.*

The Fourth Circuit has not addressed this issue in a published opinion. In an unpublished decision, it affirmed, for reasons stated by the district court, the dismissal of a plaintiff's claim that he was discriminated against by an employer who incorrectly perceived the plaintiff as being a Muslim; the district court had followed the view that Title VII does not protect one from discrimination based upon an employer's perception of an individual's protected characteristic. *See El v. Max Daetwyler Corp.*, 451 F. App'x 257 (4th Cir. 2011) (unpublished). As the Court's decision notes, however, "[u]npublished opinions are not binding precedent in this circuit." *Id.* at 257. Consequently, this Court is not bound by that decision.

Other district courts have permitted "perception" claims to proceed. *See, e.g., Boutros v. Avis Rent A Car Sys., LLC*, 2013 WL 3834405, at *7 (N.D. Ill. July 24, 2013) (finding

employer's argument it could not have discriminated because of its incorrect perception of plaintiff's race "as offensive as it is incorrect"); *Zayadeen v. Abbott Molecular, Inc.*, 2013 WL 361726, at *8 (N.D. Ill. Jan. 30, 2013) ("it makes no difference whether Zayadeen's harassers did not understand or intentionally fuzzed the distinction between Jordan and Kazakhstan when engaging in the harassment"); *Wright v. Yacovone*, 2012 WL 5387986, at *21 (D. Vt. Nov. 12, 2012) (permitting nonemployment equal protection claim to proceed; noting "[i]t would be objectively unreasonable for Defendants . . . to believe they could discriminate against Plaintiff because of his perceived ethnicity . . . regardless of the accuracy of their perceptions"); *Langadinos v. Appalachian School of Law*, 2005 WL 2333460, at *1 (W.D. Va. Sept. 25, 2005) (rejecting defendants' argument in nonemployment § 1983 case that derogatory remarks directed toward races, national origins, etc., other than that of plaintiff were not actionable; "[p]laintiffs do not lose the protection of discrimination laws because they are discriminated against for the wrong reasons"); *LaRocca v. Precision Motorcars, Inc.*, 45 F. Supp. 2d 762, 769 (D. Neb. 1999) ("The fact that [defendant] ignorantly used the wrong derogatory ethnic remark toward the plaintiff is inconsequential.  It is enough that the plaintiff's Italian characteristics [that defendant attributed to Mexican ancestry] were the foundation of [defendant's] harassment").[1]

This Court agrees with the reasoning of these cases and finds that Arsham has stated a valid claim under Title VII of discrimination based upon her perceived national origin.  Because the Maryland Fair Employment Practices Act ("FEPA") is the state law analogue of Title VII, interpretation of Arsham's claim under FEPA is guided by federal cases interpreting Title VII. *Finkle v. Howard Cnty.*, 12 F. Supp. 3d 780, 784 (D. Md. 2014) (citing *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007)).  Consequently, the Court also determines that Arsham's

---

[1] In analyzing this issue, the Court has found helpful the article, "Categorically Black, White, or Wrong: 'Misperception Discrimination' and the State of Title VII Protection," by D. Wendy Greene, *University of Michigan Journal of Law Reform*, Fall 2013, 47 U. Mich. J. L. Reform 87.

complaint under FEPA based upon perceived national origin discrimination states a cause of action and may proceed.

### B.   Intentional Infliction of Emotional Distress ("IIED")

A claim of IIED has four elements:  (1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) causally connected to the emotional distress, which is (4) severe. *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 112, 113 (Md. 2000).  This is not an easy claim to establish.

The Maryland Court of Appeals addressed the second element in *Harris v. Jones*, 380 A.2d 611 (Md. 1977):

> Whether the conduct of a defendant has been "extreme and outrageous," so as to satisfy that element of the tort, has been a particularly troublesome question.  Section 46 of the Restatement [(Second) of Torts, ch. 2, Emotional Distress (1965)], comment d, states that "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  The comment goes on to state that liability does not extend, however:
>
> > "to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. . . ."
>
> Comment f states that the extreme and outrageous character of the conduct "may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."  The comment continues:
>
> > "The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.  It must be emphasized . . . that major outrage is essential to the tort . . . ."

*Id.* at 614-15.  The tort of IIED "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct . . . of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind."  *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8, 11 (Md. 1992).  "[L]iability for the tort of intentional infliction of emotional distress should be imposed sparingly, and its balm reserved for those wounds that are truly severe and incapable of healing themselves."  *Caldor Inc. v. Bowden*, 625 A.2d 959, 963 (Md. 1993) (internal quotation marks omitted).  "The fourth element of the tort 'requires the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct.'"  *Id.* at 964 (quoting *Harris v. Jones*, 380 A.2d at 616).

Arsham alleges her psychiatrist communicated several times with DPW management to make them aware of her mental distress attributable to her treatment at work.  Further, she alleges she attempted suicide in July 2013, roughly six months before she was terminated, and, in the Court's view, this must certainly be considered a severely disabling emotional response.  With alleged knowledge of her expected reaction to wrongful treatment, DPW management allegedly continued to engage in discriminatory, retaliatory, and hostile behavior toward her.  Management's knowledge of her "emotional sensitivity can be an important factor in establishing liability."  *Kentucky Fried*, 607 A.2d at 12.  The employment relationship is also a factor to be considered in determining whether an employer's behavior constituted the tort of IIED.  *Id.* at 15.

Given the pre-evidentiary stage of this proceeding, the Court finds that Arsham has adequately stated a cause of action of IIED.  Whether Arsham will be able to carry her burden of proof before a factfinder is not a question that needs to be addressed at this point.

*V. Conclusion*

Count I, alleging discrimination under federal and state law, will not be dismissed; Arsham has stated a cognizable claim of discrimination, including under a theory of perceived national origin discrimination, and Arsham's state law claim in Count I is correctly pursued under Maryland's FEPA. Similarly, Arsham's claim of retaliation in Count II, insofar as it is brought as a state law claim, shall also be considered to arise under FEPA. As to Count III, Arsham has stipulated to the dismissal of her claim of negligent infliction of emotional distress, and a separate order will reflect that disposition. Otherwise, the City's motion for partial dismissal of Arsham's complaint will be denied.

DATED this <u>11th</u> day of February, 2015.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge